May it please the Court, my name is Anna Well-Occolino, and I represent the EEOC as appellant. The Commission brought this enforcement action challenging Freeman's use of credit checks and separately its use of criminal checks during its hiring process. The Commission alleged that the criminal checks had a statistically significant disparate impact on African Americans and on men, and that the credit policy had a statistically significant disparate impact on African American applicants. The Commission further alleged that the policies were not job-related or consistent with business necessity. Although Freeman has never disputed that the background checks do indeed have a statistically significant disparate impact based on race and on sex, the District Court granted summary judgment on the ground that our expert reports, which included Dr. Kevin Murphy's report and Dr. Beth Huebner's reports, were unreliable and therefore should be excluded under DAWBURT, which meant that the EEOC had failed to establish a prima facie case of discrimination. We also, on appeal, we argued the Court abused its discretion in finding that the reports were unreliable and abused its discretion in finding that the supplemental reports were untimely. We also argued what I believe are two legal errors that the District Court made. The first was in finding that the EEOC had failed to isolate out for challenge the particular employment practice that we were challenging, and also that the District Court made a legal error in holding that the EEOC's lawsuit was cabined by the 300-day limitation period, which is contained in Section 706 of Title VII. I thought I would begin this morning by discussing what I think we probably all agree is the heart of the issue on appeal, which is the reliability of Dr. Kevin Murphy's reports. We argued in our brief that the attacks that Freeman has mounted on Dr. Kevin Murphy's reports do not actually go to, are not a true DAWBURT challenge, because what they're doing is to complain about errors that he purportedly made with the data, but that goes to the credibility of our witness and not to the admissibility of his testimony. And DAWBURT, the Supreme Court said that reliability refers not to accuracy or to validity of results, but to evidentiary reliability, which in a case involving scientific evidence, it turns on scientific validity. So in other words, DAWBURT is about protecting juries from junk science. In this case, though, we're not talking about junk science. We're not talking about questions about Dr. Murphy's methodology. We're talking about attacks on his data. We're not even talking about a jury. This was a bench trial.  And we made the point in our brief, Your Honor, that we think that DAWBURT has even less applicability, not no applicability, but that it's not as implicated in a case where there's a bench trial as the 11th Circuit said in the Brown case, when the trial court is the gatekeeper and he's keeping the gate only for himself. What animates the DAWBURT rule is even less at play. On the other hand, I mean, if Judge Titus thought so little of your evidence at this stage, I can't imagine that he would have thought very much of it later on. I think that's true, Your Honor. And unfortunately, that may be an obstacle we face if the case were to be remanded. But I do believe that Judge Titus could perhaps come to a different conclusion if he sat as a witness to the testimony from Dr. Murphy himself and to make the credibility determination at that point. We just... Let me ask you with respect to reliability. Is there any point along the reliability spectrum with respect to data where an expert just gets it so wrong that as a matter of law, the jury should not see that evidence? I can't discount that possibility, and I think, Your Honor, there probably is such a case. We simply don't think that that was the case here. I cannot say that Dr. Kevin Murphy made a flawless expert report. Well, that would be an understatement. So, I can't say it's an A-plus report, but our point here is that the errors that he purportedly made, some of which I think had validity and others which did not, were not sufficiently serious that they undermined the reliability such that it was appropriate for the district court to toss out his testimony altogether at Daubert. So, your position basically is that no matter how unreliable the data is that goes into an expert's report, the fact finder gets to see it on the merits? I don't think our position is as extreme as that, and I don't want to say, again, that there's never a case where that could happen, but this court itself has said in several cases, in TFWS, in Burns, in East Tennessee case, that a true Daubert challenge is really about methodology, and here, Freeman is not attacking the report as being about a methodology that hasn't been tested or hasn't withstood peer review or hasn't been published or has an unknown rate of error or has not been accepted in the field. And in all those three cases- Under the rules of evidence, though, doesn't the district court have an initial obligation to ensure there's a minimum level of reliability? Yes, a minimum level of reliability, but again, we think that that goes to methodology. It goes to whether this is junk science, and specifically, I think the Supreme Court has would be confused by some kind of junk science that hasn't been tested, but that's just not this case. Well, junk science is a phrase from a dissent in a case, and it's not a term of art. It's more a short form that folks will use in artful ways, but under the rules, I thought in every case where you had an expert, there's a certain minimal threshold level of reliability that the district court's obligated to determine exists, and it looks like the district court in this case found that that simply wasn't conceivable based on the magnitude of the errors made by the expert. Well, respectfully, Your Honor, I think that the attacks that Freeman mounted were mistakes in data, and that it was inappropriate for the district court to use that to toss the case under Dawbert. This court has dealt with other kinds of mistakes, accusations that an expert report has relied on unreliable data or has failed to review certain documents that would influence his report. That would be in the Burns case about the valuation of stock, but this court has said those kinds of attacks, calculation errors, you should have reviewed different documents, you relied on unreliable data, and coming to your conclusions goes to credibility and not to admissibility, and so this court has said several times that that is just not a true Dawbert challenge. And what is the harm in this case for the district court judge to have allowed discovery to have played out, to at least have had depositions of experts, and then to have ruled on a Dawbert motion at least on a fuller record, or even to have allowed it to go to trial where he could actually weigh the credibility of the witnesses himself? And I think that the judge clearly engaged in credibility determinations. He certainly had some harsh words for our expert, accusing him of engaging in egregious scientific misconduct, but that is a credibility determination, and respectfully, we think that the district court judge was not in a position to make that at the Dawbert hearing. And Dr. Kevin Murphy also disputed that some of the criticisms were, in fact, valid criticisms. For instance, the temporal limitations of his database. He testified that it was appropriate in his field to rely on applicant data from before the limitations period, and we also cited legal authority for the proposition that it is appropriate to rely on data from before the limitations period begins. We cited the Page case for that. And also, of course, if this court were to agree with our argument about the 300-day limitation period, then it would not have been an error at all for Dr. Murphy to have gone back more than 300 days before the charge for the credit claim, more than 300 days before our September 25, 2008 letter for the criminal claim, where we notified Freeman of our expanded violation. So that would actually not even be a valid criticism. Some of the other criticisms of Dr. Murphy's database were errors such as double counting. Well, we cited a case, the Southwire case, that says that that, again, is the kind of error that could be used to undermine the credibility of the expert at trial, but isn't something that should be used to justify excluding his testimony altogether at a Dawbert stage. I'm happy to answer more questions specifically about Dr. Murphy, or I could take a minute to discuss our external population statistics, which we argued were probative of our prima facie case. Well, let me ask you about one item in particular. Apparently, your expert used a spreadsheet instead of all the discovery information provided by the defendant. And the spreadsheet stopped in October of 2008. But the claim periods for both types of claims went on for several years after that. And eventually, as I understand it, he added 19 individuals, all of whom were shown to fail for that multi-year period after October of 2008. The district court took particular umbrage at that, apparently, not only because of the But the 100% fail rate for that period didn't jive with the pre-October 2008 data, which showed a 3.5% failure on the criminal test and a 9% failure on the credit test. It's very difficult to comprehend that type of information. I agree. And I have several responses, Your Honor. The first is that even if Dr. Murphy should have, excuse me, that he should have included more applicants from after October 2008 wouldn't render what he had done before 2008 unreliable. There's no rule that I know of that says that we have to prove disparate impact for every part of the lawsuit that we potentially could have. But secondly- But you're leaving out whole years. We also cited cases that say it's not fatal to approving of discrimination to have a temporal gap. I think it was the Payne case where there was a gap of three months and also of nine months. But he does say that ultimately he included all of the applicants after October 2008. So he fixed that purported error. For those cases, when you say it's not fatal, is that because the evidence is lacking? In this case, it appears that the evidence was there, but that your experts simply refused to consider it. I think the initial report, it does appear that he did not include enough applicants after October 2008, and that the ones that he did include were people who had failed. Ultimately, though, he did, by the time of his final report, include all the applicants that he could cull out from the data with scientific certainty. So he fixed that problem. Well, and that gets to the issue of timeliness. He fixed the problems, but I mean, this was kind of a drip, drip, drip. Every time a problem was brought to his attention, he prepared a new report. That's true, and we've argued that his supplemental reports qualified as Rule 2060 supplements because they made the corrections and modifications to the data that Freeman insisted were needed, and he came to the same conclusion. In fact, every time he issued his report, he came to the same conclusion, a statistically significant disparate impact. Freeman has never shown that there is no statistically significant disparate impact, and I would submit that if they could have used the data to come to the result they wanted to, then they would have. So every time he's cut the data, he's found a statistically significant disparate impact was just shows that the errors that Freeman has pointed out were not so sufficient in magnitude that they undermined the reliability of his reports, and he did correct errors. Unlike, for instance, the Fisher versus Vassar College case, where the expert there showed an unwillingness to go back and revisit the data, in this case, Dr. Murphy did, and we cited the McReynolds case, which says that a willingness of the expert to go back and And just generally, as for the accusation that Dr. Kevin Murphy would make the data say whatever he wanted to, that's plainly not true. Dr. Kevin Murphy's applicant flow analysis failed to show a statistically significant disparate impact on Hispanic applicants, so it's not that he was just a hired gun in reaching the conclusion that we wanted him to reach. And in fact, once he fixed the data, once he fixes the problem of the cherry-picked applicants from after October 2008, we again find a statistically significant disparate impact. There's no allegation in this case that there's not a statistically significant disparate impact. The prima facie burden is not supposed to be too onerous, and Rule 702 says the advisory committee notes that the exclusion of an expert report should be the exception and not the rule. So, we submit that this is a case where the testimony should not have been excluded under Dawbert. We do think that if I've answered those questions about the external statistics that we offer through Dr. Huebner's report, that they were also probative of our prima facie case, even though they didn't stand alone to establish it. And we think there really wasn't a ground for finding Dr. Huebner's report unreliable. It seemed that the district court judge found that it was of minimal probative value, but we think that that's a different issue. So we think that we should have been able to move on in the case. And I see that I have just a minute or two left. If I could briefly discuss our argument about the timeliness in the 300 days. The argument that we advanced in this case was that it was a mistake for the district court judge to have limited our suit to the 300 days. We argued that Section 707, which allows the government to bring a pattern or practice action to address discrimination, doesn't contain a limitation period. And also that the continuing violation doctrine, which operates under Section 706, allows a party in a case such as this one, with a written policy that's consistently applied over time, to not be stuck with the 300-day limit. So under your theory, you could bring claims back to the enactment of the statute? Well, we couldn't ever get remedies all the way back because we would be limited by the statute, but that we can go back in time more than just 300 days. And we talked about footnote 9 of the Morgan decision of the Supreme Court, where the court was talking about timeliness issues in general in the opinion, but it carved out in that addressing the timeliness question with respect to pattern or practice actions brought by private litigants. What was the limitation on remedies that you see? We talked about, in our brief, the back pay limitation of Section 706G. And we said, well, it doesn't make much sense if Congress has a two-year back pay window. But under Freeman's view, every action is limited to only 300 days before the charge. And who is it who can take advantage of that two-year back pay period? It's essentially an extra year plus that the statute allows to go back for back pay, but who is it that gets to take advantage of that if every single lawsuit is cabined by the 300 days? I see my time's up. Mr. Livingston? Yes, sir. May it please the Court, I'm Don Livingston on behalf of Freeman Corporation. This is a summary judgment case. And it's not unlike most other summary judgment cases. Freeman looked at the evidence three years after the complaint was filed, made a motion for summary judgment and said that the evidence that the EEOC has produced does not demonstrate the existence of a disparate impact adverse to anyone. The EEOC responded to the motion for summary judgment by presenting a do-over, a replacement report by their expert that purported to show disparate impact. The district court judge reviewed that evidence and he found that it was not probative of disparate impact because the report, both the second report, the amended report and the report that EEOC replaced it with, Murphy's third report, were found to have been manipulated, that the data upon which the report rested was unreliable, that it was incomplete and that it was irrelevant. Nine months after briefing closed, summary judgment was teed up and the court had oral argument. In an open court like this, at the end of EEOC's argument, it presented the court with a fourth Murphy report. That's the report that counsel says Murphy says, now I've fixed all the problems. When she says that it doesn't matter because Murphy continued to make corrections and he fixed all the problems, she's referring to a fourth report that was handed to the judge at the end of oral argument. The judge dismissed it out of order. And he said it would make a mockery of the court for the court to continue to allow the EEOC to present counter arguments through replacement reports. And that's all this case is about, is whether the court correctly ruled in Freeman's favor on the basis that EEOC's statistical evidence could not present evidence of a prima facie case. The court need not resort to Rule 26E as to whether this was some sort of a corrected amendment to the report or Rule 37. Rule 26E that requires a party to make corrections and amendments to reports under certain circumstances doesn't blow up the summary judgment procedures and permit a party to use the backdoor of an amendment to continue to replace new counter arguments before the district court judge. The problems with Murphy's reports are manifest. The first report... Well, but it's also clear, though, that the court would have been required to take the evidence in the light most favorable to the EEOC at summary judgment. And if that's the case, then why isn't it enough to have that... Well, I'll talk about that. Over the three-year discovery period, Freeman provided EEOC with complete data for the entire time period covered by the EEOC's claim, including complete data for the years 2009 through 2012. The court discusses this at Section 1B1 of its opinion. Murphy utilized none of the data for 2009, 2010, 2011, or 2012 except for the 19 cherry-picked fails, which this court has already noted. One of the 19 cherry-picked fails was actually miscoded a pass. So he has his database, and then he reaches outside of his database into all of the data from 2009 and 2012, and he takes 19 persons, all of whom failed Freeman's criminal background check policies, and puts them into his database. Now, this is material. There were only 37 persons who Murphy found to have failed Freeman's criminal background check policies. Nineteen people were actually dumped in there from an earlier period. None of the passes, none of the comparison data was included into the pot. In addition, the court found that this number was, this 37 fail number was further manipulated by double-counting. The trial court correctly called Murphy's cherry-picking and double-counting an egregious example of scientific dishonesty. That's not a credibility determination. It's a manifest statement based upon problems that were undisputed about the database. In addition to the manipulation, Murphy's analysis was incomplete. It reported only a distorted fraction of the relevant time period. It excluded all the 2009 through 2012, and it used data on fewer than one-half of Freeman's locations. The analysis was irrelevant for many reasons, including that it used outcomes from two different credit check policies. Freeman had a credit check policy that it discontinued in July 2006, and it made the policy more lenient, so that people during the relevant time period had less stringent  Is it your position that the EEOC had to have an expert? No. To make a prima facie case? No, I don't know that EEOC needed an expert or didn't need an expert. Okay, all right. But EEOC's evidence was the, pardon me, Your Honor. No, so they didn't have to have an expert. The data that Freeman provided is evidence in the case, right? The evidence that Freeman provided. At that point, in terms of summary, it would be evidence. The evidence that Freeman provided is raw data that needed to be analyzed. All right. And did you analyze it? No, sir. Why not? Because there was no need to. The EEOC... No, you're complaining that their expert didn't analyze everything you put in, but then you said, well, you know, you cherry-picked. Yeah. Then you picked the rest of the cherries off the tree then, since it's your testimony. But you're saying that they failed because they didn't look at everything you had. But basically, that's the whole idea that Judge Diaz asked the question about in terms of inferences. No, they don't have to do everything, unless it's a case you have to have a positive expert. Your data is there. Their submission is basically, the theory is that your data shows that it's an impact, disparate impact on males and African-Americans. And we looked at sampling and whatever, some of it, and we found when we looked at it, it did so. And you said, well, no, there's something else you missed. Okay, we looked at that. That also found the same thing. But how does that relieve you completely to say, well, you know, you don't look at it at all. The data, the data could... So the jurors couldn't look at the data, you said, and find this for themselves. And number one, Judge Berger, the EEOC does not dispute that it has the burden of proof in showing the existence of disparate impact. Oh, exactly. Number two, and... But that could be from your data. Your data could very well give them the prima facie evidence, couldn't it? In EEOC versus federal... Could it not? You gonna answer my question? They didn't use our data, Your Honor. So we don't know the answer to the question because... None of your data. None of your data. They cherry-picked the data and selectively took the data that they used for their analysis. They left out years of data in a shockingly incomplete data set that was used for the Fourth Circuit. This court in EEOC versus Federal Reserve said the obvious. It said the statistical analysis is only as good as the underlying data. Here, it's not just a question of they didn't use all the data. They miscoded the data that they put in the record. The district court judge uses an example of the 41 persons who EEOC identified to Freeman in discovery as the persons for whom the EEOC would seek relief. These are people who were denied jobs. The court looked at these 41 persons, the people we knew best. Each of these people were deposed. There was no reason to miscode them in the database. But in Murphy's database, seven of them were not there. Nine of them were double-counted. Ten of them had no race codes. Three of them had no background check results. Three of them had incorrect background check results. Five had incorrect gender codes, including Denise, Marjorie, Sholanda, and Natasha, who were all coded male. And one had an incorrect race code. Now, we didn't look at all the data. We didn't search for all the mistakes. But we did look at the people who EEOC said were claimants, and we pulled those out of the database, and we said, oh, my God, this database is just loaded with errors. It's in shambles. He didn't look at the relevant time period. Instead, he substituted data from the previous time period. He combined policies and used data from a policy that no longer existed. So it's the fact that this database was unreliable, that his analysis was unreliable, that entitles Freeman to summary judgment. And that's the Salovec case in the Supreme Court, Your Honor, which says that we don't have to disprove the claim, that the EEOC has to demonstrate that it can show disparate impact. And the EEOC failed. Now, the EEOC, again, claims that it could do so with the final report prepared by Ms. Murphy. But as I've shown, that report was presented after summary judgment briefing had closed. And in oral argument, it was to be included in the record if the court granted the EEOC's motion to file a SIR reply under Daubert. The court denied the motion for the SIR reply. And as you know, motions for SIR reply are disfavored. So that report never went into the summary judgment record, except as it was presented to the court, but the court ruled it out of order. Are you running away from the district court judge's conclusion under Daubert in Rule 702? No. Okay, so. No, the report was so riddled with errors that it was unreliable and therefore didn't meet the standard of Rule 702. Because that's what the judge relied on, it seems to me. No, no. The court did, but in the alternative. The court didn't say there's the, it could look only at the second Murphy report, the report that Freeman moved for summary judgment on. The court also considered the replacement report and found that it was uninformative on the question of disparate impact because it didn't correct the problems. All the problems that we presented to the district court as part of our summary judgment, Murphy said and EEOC said were corrected by the replacement report. The district court judge looked at the replacement report and he said it doesn't correct the errors. He said Murphy says that he took out all the data before July 2006. The district court judge found that there were over 200 applicants from before 2006 that Murphy didn't take out. Murphy said he took out the cherry-picked 19 people from his previous analysis. And the trial court looked at the record and said he didn't take them out. He found it astonishing that Murphy didn't make the corrections that Murphy said he made. The fourth report, the one that was presented during the summary judgment oral argument, was now designed to do the things that Murphy said he had done in the third report, is to correct the errors when he had not. And the district court judge says you're making a mockery of the proceedings. You can't continue to give me replacement reports. What I'm saying about Rule 702 is, is it's not necessary for the court to review, to consider because there's no evidence of a prima facie case. But the trial court did in the alternative find that the report was so unreliable based upon all of these flaws that it didn't meet the evidentiary threshold. And Rule 702 says that the expert's opinion must be based on accurate, on adequate data, which this report wasn't. And it has to use adequate methods, which this plainly didn't, given all the exclusions and the errors and the miscountings. Now, I do want to point out that Murphy, the expert Murphy, he blamed Freeman. In his replacement report, his second replacement report, his replacement report said that the errors in the database were errors that were in the records. So as Judge Gregory said, couldn't you have used our records? Couldn't want the records in the record? And what the court found was is that the documents that were produced from Freeman didn't have the errors in them that Murphy's database did. The incorrect gender coding, the incorrect race coding, the incorrect pass-fails and so on were correct in Freeman's data. They were not correct in Murphy's data. It didn't meet the reliability threshold of Rule 702, Judge Diaz, and was properly ruled as inadmissible. But that was an alternative holding after the court had examined Murphy's replacement report and found that it was uninformative on the question of disparate impact for all the reasons that we discussed. With respect to the EEOC's position that it is not subject to statute of limitations when it brings a lawsuit under Section 707, that's directly contradicted by Section 707E, which says that when EEOC investigates or, quote, acts on a pattern or practice charge of discrimination, it must follow the procedures of Section 706. In this case, it has a charge of discrimination filed by Katrina Bond. In Section 707, EEOC acted on that charge when it sued Freeman. And therefore, the procedures of Section 706 that apply when EEOC sues ordinarily, when it's not bringing a pattern or practice case, are also applicable. The EEOC says, well, some of them might be applicable. For example, it said that there's a limitation on damages. That's in 706G. It would be applicable, but not the charge filing limitation in Section 706B. Well, why 706G damage limitation, but not the 706B charge filing limitation? The EEOC has no answer as to how 706G gets incorporated into pattern or practice cases through 707E, but not the charge filing period of 706B. And the answer is, is that everything gets incorporated. Congress drew a bright line when it said that 706 pattern or practice charges will be investigated or acted on pursuant to the procedures in Section 706. That means everything. And if one attempts to gerrymander Section 706, it comes up with the result that EEOC is positive today, that the provisions that they think should be in are in and those that they think should be out should be out. It's also nonsensical to think that an individual who was subject to discrimination in 1965 would be barred from asserting a claim that he was denied hire in 1965, but that EEOC can somehow resurrect that claim by bringing a lawsuit under 707 and calling it a pattern or practice of discrimination. But that would be the result if the EEOC were to prevail on its interpretation of the 706 procedures, 707 pattern or practice procedures. Let's say one other thing about this. 707 was originally written for the Justice Department. It gave the Justice Department the power to bring pattern or practice cases against state and local governments and against private employers. In 1972, Congress took the private employer portion of it and it transferred it to EEOC. That's in 707C. And 707C says that this transfer function will be in accordance with 707E. That's the incorporation provision of Section 706. So all of EEOC's actions under 707 are subject to 706. But what about the Justice Department? It didn't put the Justice Department under Section 707E, plainly intending for there to be a different practice with respect to the Justice Department than the EEOC. EEOC must process, handle, and litigate Section 707 cases under the same rules that apply to the EEOC when it's used under Section 706. With respect to the EEOC's argument, with respect to general population statistics, there are cases that look to general population statistics, including cases of this court. I'm thinking of a case involving the New Corps. But in that case, the employer had destroyed data. And the court was not going to penalize the plaintiff and say you can't prove disparate impact because you have no data when the defendant had destroyed the data. And it allowed the plaintiff to rely upon a proxy, a substitute for the more accurate data. And the court noted that the applicant flow data would be the accurate data. The proxy data, not as good, but we'll let you use it because of the plaintiff's, because of the defendant's destruction of the evidence. In this case, we don't have that. All the records were preserved. All the records were produced. All the records were accurate. And EEOC and its expert didn't use them. Bottom line is the EEOC didn't do the work. In Wards Cove, the court cautioned that when using general population statistics, they have to be carefully tailored to the jobs in question. So that the persons who are in the general population are persons who would be expected to be applicants or employees of the employer for employer jobs. No tailoring was done here. And in addition, the general population statistics deal with features of criminal justice system entanglement, which are not part of pattern or practice, which is not part of the policies or practices at Freeman. Freeman uses criminal convictions to determine whether or not to make hiring decisions. The general population statistics that were produced by the experts deal with other things. Incarceration rates and arrests, for example. Thank you for your attention. I appreciate the opportunity to be here to argue before you today. Thank you. I'd just like to address a few points. Congress gave the EEOC an important role in these cases. Title VII, Civil Rights Act, to enforce these things. These cases are very important. I understand. Why does the EEOC present cases with expertise like this in cases so important like this? Why don't you even appeal the case? I'm sorry, why do we appeal the case? In the cases, a lot of interest, a lot of very important issues in this case here. And you're coming here as district courts, as an ambassador expert. We have a tough job. You have the best experts in the country. I mean, it's such an important arsenal of government behind you. Why is it so thin in this case? And you're coming back. Is that correct what counsel said, that on the day of the hearing, you come and get a fourth supplement? Oh, that's correct, isn't it? We had given the supplemental report to Freeman's counsel prior to the hearing. Oh, how much prior? I believe it was three weeks prior. And so we had served it on counsel. But you're asking good questions. And hopefully it seems like you agree the EEOC has an important role in this country in enforcing civil rights. Absolutely. And you're troubled by the fact that our expert made mistakes. I am troubled. Not made mistakes, but just, I mean, it's, as district court said, it's unbelievable. He made mistakes. I can tell you internally I asked about Dr. Kevin Murphy and was told his reputation had been very good before we selected him. So we are stuck with his expert reports. And the question is not necessarily whether he made errors. I can't tell you he didn't make errors. But the question is whether his errors were such magnitude that they undermined the reliability of his reports such that it was appropriate to not even let our case go to trial. And we think that it was not. I also, why did we appeal? We have an abuse of discretion standard and I know very well what an obstacle that is to winning this case on appeal. But this case brings up important issues. The district court, to be honest, seemed to really question the whole theory of disparate impact, seemed to question the validity of our challenges to the use of criminal background checks at all. And I find that very troubling. I hope that this court does too. Another reason that we appealed that we haven't talked about yet but I think is of critical importance is the district court's view that we had failed to even isolate the particular employment practice under challenge. And that is a ruling that will trouble the agency, not just in this case, but in all the cases that we hope to have yet to come where we make these kinds of challenges. I think one of the things that troubled the district court though on the criminal conviction data was that it was trafficated. You had convictions, you had outstanding warrants at the time that were unresolved for the applicant, and then you also had a class of individuals who had lied. And apparently there was no even attempt to differentiate between those classes and lump them all together. And it's hard for me to comprehend how the agency could say, we're going to treat liars to the employer the same way that we treat convicted felons. The end result of that policy was whether you were a liar or whether you had a misdemeanor drug conviction or whether you had an assault, you were treated the same way. You were disqualified for hire. So our position… That's the point, isn't it? I mean, it's one thing if you're going to have conviction data. But here you have data that treats the liar to the employer just like the convicted felon. But it's all part of one particular employment action that we challenged. The Supreme Court has never suggested and the statute does not say that we have to identify which sub-factor of a particular employment practice caused this… Okay, we're not communicating here. Is it the agency's position to treat liars the same way as convicted felons? Because Freeman treats them the same way, yes. Because their policy treats them the same way as somebody who's been convicted of a crime. Yeah, but Counselor, Judge Agee asked a very poignant question. Are you saying that the pattern in practice in terms of disparate impact, I thought it was based upon bad credit and or criminal convictions, misdemeanor or felons, right? Correct? Separate policies. Right, separate policies. How do you put liar into that mix and then report out liars and say, well, if they don't hire liars too, that goes in the same bin and report it out as an occurrence? Because that's all part of how the criminal background check policy works and separately how the credit background check policy works. But tell me this, how are you picked up as a liar without being a criminal person convicted of… When you apply, I don't know how you determine somebody being a liar anyway, but okay, you weed out people. Okay, felons, misdemeanor. Where's the weed out process for liars? How does that work? They run the background check and they say, hey, this guy told me about the misdemeanor but not the felony conviction or didn't tell me about anything. Oh, oh, oh, oh. So it's lying about having a conviction. Yes. So it's all part of the same policy in the EEOC's view. Well, that makes sense. But is that policy something that the EEOC is concerned about? It seems to me eminently reasonable that an employer might not want a liar on his or her staff. Well, I think it could have a statistically significant disparate impact when you're saying I'm not going to hire you if you're dishonest on this application form about your background policy. So what you're doing, you may have a statistically significant disparate impact because who is it who's going to be lying about their criminal background check? People who have a criminal background check. So the use of the policy is causing the statistically significant disparate impact. If I don't have a criminal background check problem, I'm not going to lie about it on the form. So that's why we think it's all part of the same policy. But you have no way of differentiating whether 100 applicants who may be convicted felons and who weren't hired, they didn't hire 10 of them because they said, yeah, I got a conviction, but it's so bad we're not hiring you. And 90 who lied about it, you don't know how the employer made that differentiation. Well, the employer treats them all the same. Criminal treats them the same. They're not hired. Right. A liar also would have been in the category of a person with a conviction as well. Yeah. Yeah, exactly. If you have no conviction, you're not going to lie about it. I'm not going to write down a conviction and you find out, gee, I don't. Right. Exactly. They hired somebody by lying about having one and didn't have one. Everybody who lied had one. Yes. Right. That's the point. Yeah, absolutely. And plus, in the evidence in the record, they're saying that it was meant to be sort of a chilling effect. Absolutely, Your Honor. They admit that. That was their intent, was to discourage applicants with negative information from applying, which I think is the reason why our external statistics are probative. Right. And I think that's what disturbed by this case, that even though notwithstanding some clear error or some problems with the expert, there's nothing in here to dispute the fact that this has a disparate impact on blacks and males. Yes, they never disputed that. Absolutely. It's undisputed. In this case, whether it's discretion, whether or not it's like whether you have a declaration at the last minute that a man or woman is innocent, you say, well, I'm sorry. We already fired up the electric chair. It's too late. But these things are like capital punishment for people who can't get jobs, who can't have an opportunity of an American dream, notwithstanding that they've had problems. So I understand. Was Judge Stites correct when he said that, in fact, you're challenging a practice or policy that your agency engages in? Was he right? We had to follow the rules from OPM, Office of Personnel Management. So we do have to run background checks. The problem with that argument, and we've gotten that attack in the Kaplan case as well, is that there is no showing that we've used those checks, which we must run to actually screen out anybody from a job. So maybe you run the checks, but if there's no statistically significant disparate impact, there's no violation. What's the point of running the check, then? We have to run the check. OPM tells us what to do. But beyond that, Your Honor, the fact that maybe the EOC is occasionally discriminating against somebody in promotion, that that doesn't exonerate private employers. I get that. It just seems a bit ironic. I agree. It's kind of like federal judges. We decide these cases, but Title VII doesn't apply to us either in terms of hiring our clerks. Thank you, Your Honors. Thank you. All right. We'll ask the clerk to adjourn the court for the day, and then we'll come down and greet counsel. This honorable court stands adjourned until tomorrow morning at 8.30. God save the United States and this honorable court.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz